Welcome to the court. We'd like to recognize visiting Judge Virginia Kendall from the District Court for the Northern District of Illinois. She sat with the panel yesterday and with this panel today. We thank her for her generous extra efforts because, of course, like the other judges in her district, she has an enormous trial docket and she's very generous to help us out here. So thank you and welcome. Thank you. We have four cases on the argument list this morning. Two more cases are being submitted without argument later today on the briefs. Those are Appeal 3235, Cabanian v. Merit System Protection Board, and Scott v. Department of Veteran Affairs, the Scott case being Appeal 7142. And our argument list, we'll hear argument first in Power-One v. Artesyn Technologies, Appeal 1501 from 2008. Mr. McGaughan, good morning to you. Welcome. Please proceed. May it please the court and good morning, Your Honor. There are two issues that I'd like to discuss today. The first is the indefinite nature of the claims at issue and the court's construction of those claims. And the second is the obviousness of the claims that are asserted in this case. Turning first to the issue of indefiniteness, the District Court erred in finding the asserted claims not to be indefinite as a matter of law. The indefiniteness of the claims arises because the most critical limitation in the claim, the limitation requiring point-of-load regulators, fails to define the subject matter of the claims with the particularity and distinction required by 35 U.S.C. 112 and by the precedent of this court. The issue was raised below and the District Court rejected it and adopted the construction of point-of-load regulator or POL regulator that was advanced by Power-One. That was error. As this court's precedent dictates, when construing disputed terms in a patent claim, one should look to the claim, to the specification, and also to extrinsic evidence to see if the term had an accepted and ordinary meaning. Here, consideration of all three of those is reflected in the record, shows that the term point-of-load regulator did not have a precise indefinite meaning. First, if you look at the language of the claims. Well, would a person of ordinary skill in the art know what that means? No, Your Honor. Why not? They would not and that's reflected in the record. There were questions asked prior to the Markman hearing of witnesses asking them what they defined point-of-load regulator to be and they all indicated that while they had a general understanding that a point-of-load regulator was a regulator that was somehow affiliated with the point of a load or the point of power consumption. It was near. Well, Your Honor, near was not actually in the claim or in the patent itself. What happened was Power-One proposed a construction indicating that a point-of-load regulator was a regulator that was adapted in some unspecified way to be used on a printed circuit board near a load as part of a distributed power system. And so depositions were taken where Power-One provided a witness and Arneson provided a witness who was asked, can you explain exactly what that means in precise indefinite terms? And when those witnesses were asked, they could not specify any kind of quantitative metric, any kind of clear examples that could be used to determine whether a given regulator is set before them was adapted to be used on a board or near a load. In particular, this was problematic because the prior art included a number of power regulators that were used on a printed circuit board to power loads on those boards that Power-One contended were not point-of-load regulators. Their argument was that these types of regulators, even though they were used on a board to power loads on that board, were what they defined as brick regulators. So when Power-One's witness was asked about these questions, to ask not just what does it mean, but how specifically, what criteria and objective information could you use to determine whether a given regulator was or was not a point-of-load regulator, he was unable to provide any precise metrics, especially when he was queried to be as precise as possible. This testimony is reflected in the appendix at page A3798 through A3801. And in those questions, the witness was asked to be very precise. Can you define what that means? And he says basically the definition that the court has doesn't mean it's capable of being placed on a board in a power system. Well, what's the indefinite part? The word regulator or the phrase point-of-load? I think, Your Honor, in the claim term itself, point-of-load regulator, as a phrase, is indefinite because the words themselves do not tell you what kind of regulator is a point-of-regulator, how does that differ from what it means. Well, when you read this whole patent, it seems quite clear what the regulator does. It changes the voltage for the particular little circuit that's being supplied with power by converting it down or up as needed. Your Honor, I think there's no question that a regulator provides... So then only ambiguity would seem to be point-of-load. But again, when you look at the rest of the patent, it's just upstream of the circuit that's being fed with power. Your Honor, that is actually not the definition the court adopted. If the limitation said it was a device actually used on a board... I'm just trying to understand what you think is ambiguous. The concept point-of-load, Your Honor, and as an example, one of the prior art references that was advanced at trial is the Melcher G reference, which is at appendix A-514. And the Melcher G device is a small DC-to-DC power regulator that was acknowledged to be used on a printed circuit board, acknowledged to be used to power loads on that board. Power One argued that that was not a point-of-load regulator on grounds that that was not adapted to be used near the load, because even though it was on the same board, that device was not something that was adapted to be used near. Now, Power One's expert, when asked specifically about this question, acknowledged at page A-406 of the transcript that the Melcher G regulator could be used as a point-of-load regulator. So the issue is point-of-load regulator doesn't describe any inherent structural characteristics of a regulator, but rather an application of a regulator. And the problem with the claim scope is for the public, trying to design regulators that use... Well, I think it had to do with the location of it. Your Honor, the claim scope... The regulator just converts from one voltage to another to feed a particular circuit or a part of the board, and the point-of-load seems to tell the reader that it's immediately upstream of the thing being supplied with power. Your Honor, if you look, for example, at claim 23 of the patent, it simply recites a point-of-load regulator that has a serial communication link and a power conversion circuit, and that is directed to the device itself. So people in the public who are trying to make regulators will need to know, looking at the regulator itself, whether it's a point-of-load regulator or not, and there's no objective criteria to determine that. Had they claimed simply a system with A, B, and C, where three regulators are tiered in a particular order and the regulator that's the closest to the load has these features, that may be one thing, but the claim that they have is directed simply to the concept of a point-of-load regulator for claim 23 or claim 1, which recites a system having point-of-load regulators. Why are you so resistant to my suggestion that, as a matter of common sense, it means immediately upstream from the circuit being fed? Your Honor, I would agree that, as a matter of common sense, the point-of-load regulator, if you were to look at a circuit board, would be the one closest to the point of the load. The difficulty is, where you try to define a patent claim to a device in terms of a potential intended application for that device, you fail to allow the public to reasonably know, looking at a particular device, is this regulator one that a court will deem to be adapted to be used on a board near a load? And this is especially important here, where the prior art includes regulators used on a board to power a load on that board that have the feature of the claim that was pointed out as being the novelty, is the use of digital serial communications. You seem to be complaining that the phrase isn't self-defining. But it doesn't have to be self-defining if its meaning is made clear from the rest of the specification. Precisely, Your Honor. I don't disagree with that at all. And my point is that the language of the claim is not self-defining, and that if you look to the specification to see if it provides a definition for the term, you find that it doesn't. The specification almost never defines claim terms like a statutory section that says in this statute the word so-and-so means so-and-so. But it doesn't have to define it in a formalistic way as long as an artisan can tell what the claim term means by reading the rest of the specification. Your Honor, I would agree with that. For example, in the Exxon case, where there was a limitation in the claim that talked about to substantially increase, and the specification indicated that meant to increase by 30% or more as measured by this test, you would have an example where the specification provided an enlightenment as to what that meant. Here the term POL is simply used in the specification without a single example or without a single qualitative metric to explain what that means. How about the specification that says the POL regulator would be physically located adjacent to the length of the low-voltage, high-current lines or by locating the POLs close to their corresponding electronic circuits? Your Honor, I think that shows that the application of a regulator close to a load would be a point-of-load application, but that statement doesn't allow you to pick up a regulator that one may want to sell and tell whether it's a point-of-load regulator or not. And I think in the transcript, Power I talked about brick regulators, and brick regulators were prior-art regulators used on a circuit board to power loads on that board that had digital serial communications. And Power I argued repeatedly that brick regulators were not point-of-load regulators, and they argued that brick regulators simply were not, but the record shows... What is it that you think needs to be added? That a point-of-load regulator is that regulator that's within 2 centimeters of the circuit being fed? Well, is that the problem? It doesn't have a number in it? I think if there was a number, that would provide some objective criteria, but the claim itself is to the device itself. And, for example, on the brick regulators, Power I acknowledged that brick regulators could be used in point-of-load applications. If you look at the record in particular to some of the articles that were before the Court, and the article at A3810, it talks about using bricks in point-of-load applications. And if you look at the other articles that were cited to the Court, in particular the article at page A2843, it basically says that a point-of-load is essentially a less expensive, non-isolated DC-to-DC brick. So the point is that point-of-load is an intended application, not an inherent characteristic of the device, and so it cannot be used to define a device in a definite way. And I think this leads directly to the issue of obviousness, Your Honor, which is that there is no meaningful difference between a device that is a point-of-load regulator from a structural standpoint and a standard regulator. If you look at what the claims were directed to, they're directed to a point-of-load regulator that has digital serial communication capabilities. Now, the prior art in this case showed regulators with digital serial communication capabilities. In particular, there was a prior art reference called the SIPI reference, which is at A458 through 485, which disclosed standard commands for programmable instruments and had an entire chapter... Was that prior art that was listed in the 125 patent? No, Your Honor. This was separate? It was not. None of the prior art that's discussed in the brief, the SIPI reference, the Duffy or the Vigeli or the Melcher, were before the Patent Office. And there was testimony from Mr. Stewart that the SIPI patent was just a protocol language, not a power supply that neither he nor his company had ever designed or manufactured, and it did not suggest doing board-level power management using smart POIs. Your Honor, the SIPI protocol was the standard commands for programmable instruments, and what it had was a chapter saying these are commands you should use with power supplies, the commands to turn them on and off, to increase or decrease the voltage. So it's correct that the SIPI reference itself wasn't a blueprint to say here's a power supply, but the whole purpose of the reference taught those of skill that serial communications can be used to program, control, and monitor power supplies. So the notion that it would be a novel idea and not obvious to take a regulator, which they would label a point-of-load regulator, and program, control, and monitor that through serial communications would have been obvious because SIPI told you that serial commands can be used to program, control, and monitor power supplies of any type. But the subject of the 125 patent is this board-level power management using the smart POLs, which is not addressed in the SIPI. Your Honor, I agree that the exact subject matter is not the same, but as this Court has held in its ICON opinion, when you're looking at a particular problem and trying to find out whether it's obvious or not, you don't have to look exactly at what the patent says. You can look to devices that are reasonably pertinent to the problem at issue. So, for example, in the ICON case, it notes that if you're trying to develop a latch for a computer, a portable computer, you can look at latching mechanisms that are directed to kitchen cabinets, machines, audio cassette devices, or pianos. And in this instance, SIPI tells you for power supplies, generically, you can use serial commands to program, control, and monitor them. Well, let's assume SIPI is not going to suffice for you for prior art. Any others? The design note, the Melcher? Yes, sure. The Melcher design note, which I mentioned before, shows a board-level DC-to-DC converter that specifically talks about using serial communication so that you can communicate with the device and you can receive monitoring information from the device. It also talks specifically about being able to set the types of monitoring that's done. So the general idea of using serial communications to program, control, and monitor a board-level small DC-to-DC power system is shown there. Also, Your Honor, there is the prior art Vogeli reference, which the Vogeli reference shows a prior art reference that talks about a power system all located on a board. But again, brick powers, right? Not POL. Well, Your Honor, that's why this issue of what the difference is between a POL regulator and a brick regulator is. What Vogeli shows are a power system controller communicating to a plurality of what it labels power supplies all located on the same board, all powering devices on the board. So whether you call that a point of load or whether you call that a brick, it may depend on exactly how long the lines are. But not bidirectional lines, right? Well, Your Honor, the power system controller in Vogeli controlled the power supplies using unidirectional lines, but it talked about an alternate embodiment where that could be combined with bidirectional lines. And if you look at the prior art in terms of the Melcher design and the SIPI reference, and there's also a Duffy reference, they all teach the idea of monitoring the power supply to look at what its output voltage is or look at what its... All right. Time has expired. Thank you, Mr. Smith. Good morning to you. Welcome to the court. Thank you, Your Honor. How do you respond? Good morning, Your Honor. May it please the court, I'm Alan Smith representing Paro One. Let me first talk about point of load. Point of load was a well-known device in the industry. The patent says that it was a known device, and when you look outside the patent, you see that it was a known device. Artisan and the evidence of record shows that Artisan, at the very time of the filing of the patent, was selling a family of products they called Poles. There was an industry alliance called Polo, point of load alliance being created at that time. There was a number of contemporaneous articles, in particular an article written by Artisan at that time that used the term point of load. What about this problem that the term near that was adopted by the court doesn't have some kind of mathematical equation? We don't know how many centimeters away the power supply is, and that it would potentially render it vague according to petitioner. Yes, Your Honor. A claim doesn't have to have a particular set of numbers. Many cases have been affirmed by this court where it did not have that. For example, in the Young case, in that case it said that the incision was to be near the edge of the claw. This referred to an animal. Obviously, every animal is a different size, and so you can't give a particular number of centimeters. In the MIT case, the claim referred to an original must be placed on or in close proximity to the scanner. It depends on the power of the scanner. It depends on how the scanner is designed. In close proximity was affirmed by this court. So, a claim does not have to have a set of numbers in it, and in this case it can't, like in most cases, because then the claim would be so narrow that competitors would simply add an extra centimeter and move away from the genius of the invention. But this patent does provide enough information within it, and people of ordinary skill in the art, which is a test for claim construction, knew enough. So, for example, as your Honor referred to the claim, the patents say the word close, and they say the word near. And they describe what's meant by that. At that time, electronic loads were becoming more and more sophisticated. Our chips are becoming more and more sophisticated in this world. And so they needed lower voltages and higher currents. And what the patent says is that typically you had bricks at the edge of the board, and then the power flowed all throughout the board to get to all the loads. And the patent says that that is difficult to do. As you have this low voltage, high current traveling throughout the board, you have impedances which affect it. You have power being dissipated. It's very hard to regulate the power. So this new class of products called point-of-load, just like the term says, were placed at the point-of-load. But doesn't it really depend on the environment of the invention itself, if it's a geographical type of GPS? We could be near the White House from here. In a microchip you're talking about different sizes and different perspectives. So it's all reasonable perspectives, what you mean by near or proximity to, isn't it? Does the environment that you're working with make a determination of what near is all about? I agree with you completely. And the test for the construction is whether or not it would be understood by a person of ordinary skill in this art. So in this art that brings it out of the GPS world and brings it into the power supply world. And what the patent says, it had to be near. And in the patent it gave examples. It said when you're dealing with low voltages like 5 volts and 3 volts and 1 volt and you're dealing with high currents like 100 amps, you can't transfer that power and keep it well regulated if you are far away. You need to be near to the device. Now my question, though, what happens, why isn't a POL the same as a brick, a controlled brick power source? Your Honor, that's a good question. And the answer is because the POL was designed to be scattered throughout the board. Part of the construction is, and Artisan doesn't dispute it, part of the construction is as part of a distributed board-level power architecture. And as shown in Figure 1, you see multiple POLs. So they need to be scattered throughout the board, which is going to affect their size. They can't be a big brick, as the name brick intends. By the way, you don't have to worry about the board, you don't have to worry about heat considerations. You're going to have to deal with the voltages. What is the basic difference between a brick which is controlled, where you can control the power output of a brick versus a POL? What is  essence of the difference between the two? The essence of the difference, Your Honor, is that it was designed not to sit on the edge of the board. It was designed to nestle in with the loads that are being powered. And if I could, Your Honor, this term near was a term known in the art. When Artisan came out with the device that infringes, Artisan said to overcome challenges of high       voltage and high current. The transients were an issue. There were a number of different issues. So when you take this POL and you put it close to the loads, it may be powering two or three or four loads. It may be a little closer to one and a little closer to two. So the ordinary skill in this field knew what it meant. So now transitioning to the argument of obviousness, we're not here and this isn't the district court. We have to look at the evidence below. Below was a clear and convincing evidence standard. Here it is now we look at the evidence supporting the jury verdict. In essence we look at the brief. We grant all reasonable inferences and we say that that amounts to substantial evidence for the jury to find that Artisan did not carry its burden of proving by clear and convincing evidence that the patent is invalid. Normally what you expect to see is you expect to see them take a reference matched up to the claim and say this reference has this element, this reference has this element. You don't see that here. You see figure two is close and then there is this cloud of serial bus art. The reason is because none of these references match to the claim. Every single prior art reference that Artisan is proposing has to be redesigned and reengineered. If you put them together the way they existed you are nowhere close to the claim. Moreover... Could you address the Vogli prior art if I'm saying that Vogli describes and if I could the claim requires that you have your point of load regulators, you have a system controller and then you have a parallel bus between those two that are carrying programming control and monitoring information and that serial bus is going to all of the poles. Vogli actually is just like figure two. Vogli had separate lines going to each regulator. It was a brick but it doesn't matter. Let's just call it a   pole. Let me answer that in two parts. The first part is even if you took a brick and called it a pole, none of the elements of the claim are met by the combination that Artisan is arguing here and I think perhaps that's the easiest way to look at it. There was no witness at trial who testified that you take figure two and combine it with all these other pieces of prior art. No witness. In our opposition we said show us citation. In their reply they came back with nothing. They said the jury carried the patent into the jury room. So they must have thought of it. That's ridiculous. If their own expert and no one at trial said combine figure two with all that prior art and it renders it obvious you can't fault the jury for not reaching that conclusion. The prior art of Vogley for example had a system controller it had all these separate lines going to the regulator just like in figure two. On the other side of the system controller there was a bus. Now the patent actually says that that bus is preferably a set of conducting lines. And this is in the patent A508 and it's in column six at line 62 to 63. And in fact we asked their expert about that and this is on A2330. Do you see where it says in the preferred embodiment there is actually a unidirectional power control bus? Answer, that's correct. Question, in fact the preferred control bus isn't I2C which is the serial bus. And the question goes on, it says it's a bunch of control lines, isn't it? Answer, that's correct. And then we went further because in the patent it says well maybe you can switch out these buses and you can combine them. But that's not, it says maybe, but that's not the preferred what Vogley teaches. And so we asked them again and this is continuing on the next page 2331 to 2332 at the bottom. I'm asking you, am I reading this correctly that the highlighted passage says you really don't want to join buses with the communication bus? You want to use dedicated lines? Isn't that what that says? Answer, that is correct. The jury had every right to conclude that the teaching of Vogley was to use dedicated unidirectional lines just like in figure 2. So the serial bus, there's no evidence there was a serial bus between the system controller and the regulator. Skippy is similar in a sense. Skippy is about, let's suppose you want to test the computer and see how it stresses for power. You have a test box. Skippy is a protocol that sends commands to this test box. But there was no evidence about what happened to those commands. There was no evidence that those commands ever got to the regulators or ever at the board level. It was just a big box that serial communications came into. So that is a single reference where you have a serial bus between the system controller and the regulator, whether it's a brick or a pole. Your time has expired. I'll give you back two minutes. I didn't know you used all your time. Thank you, Your Honor. Just a few brief points. On the one hand, you can figure out what's being claimed with precision. Here, the claims at issue do not reside in an environment that makes it clear that the regulator they're talking about is the one on this side of the load as opposed to the one on the other. The claims themselves do not simply say point-of-load regulator without providing an environment that makes it definite what they're referring to. I think if you look, the precise question was asked to Power One's expert witnesses, the question that was exactly asked, how can you differentiate from me on a technical standpoint what's different between a point-of-load regulator and from what's different between a brick regulator. And Power One's expert witness testified at trial in portions referred to in debris that he could not really identify any way to distinguish those two. He indicated that perhaps he could call them a point-of-load regulator and finally he ultimately decided because they labeled it a POL regulator it must be a POL regulator. The issue for the indefiniteness is not looking back at a product that someone has labeled a POL regulator but looking to the public to decide what they can and cannot do and determine whether what they're building is or is not likely to be deemed to be a POL regulator. On the obviousness issue, just a few points, the concept of a POL regulator was admittedly known in the art. The use of serial commands is taught by SIPI and applying it to a particular type of power supply would have been obvious and a common sense thing to do. It would have been straightforward. We thank both counsel. The appeal is submitted.